Filed 8/18/20  In re Andy T. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re ANDY T., a Person Coming Under the Juvenile Court Law. | B300793<br>(Los Angeles County<br>Super. Ct. No. 19CCJP03862A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>         Plaintiff and Respondent,<br><br>         v.<br><br>H.T.,<br><br>         Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Craig S. Barnes, Judge.  Affirmed in part; reversed in part.

Maureen L. Keaney, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kristine P. Miles, Assistant County Counsel, and Brian Mahler, Deputy County Counsel, for Plaintiff and Respondent.

_____

H.T. (Father) appeals from the juvenile court's jurisdictional findings under Welfare and Institutions Code[1] section 300, subdivisions (a) and (b)(1), that Father physically abused then-six-year-old Andy T. Father also challenges the dispositional order removing Andy from his physical custody under section 361, subdivision (c)(1). He contends there is insufficient evidence to support the jurisdictional findings and removal order. We reverse the jurisdictional finding under section 300, subdivision (b)(1), but otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The June 16, 2019 Incident*[2]
On June 16, 2019 Father was driving home with Andy after picking him up from a cousin's house. Father parked the car at a gas station because Andy was crying, had unbuckled his seatbelt, and was sliding down onto the carpeting. Father picked up Andy and entered the convenience store.

---

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

[2] The facts are taken from the detention report and the police reports attached to the jurisdiction and disposition report.

The store clerk saw Father and Andy enter the store together.  Andy "was crying and sobbing uncontrollably" and his "eyes were also red and 'puffy.'"  Father told Andy to "shut up" while Father purchased cigarettes.  Once Father and Andy were outside the store, Father grabbed Andy by his shoulders "very abruptly and violent[ly]."  Father carried Andy to his parked car and appeared to strike Andy on his back.  Father then threw Andy inside the car so violently that it caused "the vehicle to shake."  The clerk saw Father strike Andy five or six times with both hands, but he could not see if Father used an open hand or closed fist.

Two customers at the gas station also witnessed Father's interaction with Andy.  The couple observed Andy crying while Father was trying to leave the store.  They saw Father pick up Andy with both hands, walk to his car, and throw Andy into the right rear passenger seat.  Although the woman could not see what happened next, her boyfriend reported Father stood next to the car's open door and struck Andy with both fists.  The boyfriend stated he confronted Father and told Father he was calling the police.  Father then got into his car and drove away.

Less than five minutes later El Monte Police Officer J. Edwards located Father's car and conducted a traffic stop in response to a call regarding possible child abuse.  Officer Edwards observed Andy "was crying, sobbing uncontrollably for the first 5-10 minutes" and his "right face (cheek) was very red."  Father agreed to go to the police station with Andy to discuss the incident.

At the police station, Officer Edwards arrested Father for child abuse (Pen. Code, § 273a).  Officer Edwards observed Andy had numerous marks on his legs, but they appeared to have been

3

caused by active play and not abuse.  After approximately two hours, Andy became calm enough to talk about the incident. When Officer Edwards asked Andy whether he knew the difference between the truth and a lie, Andy did not respond. Officer Edwards asked what happened, and Andy stated Father "got upset and slapped him 10-20 times across his face."  Andy did not provide any more information because "he was afraid of the police."

After waiving his *Miranda*[3] rights, Father told Detective Eric Walterscheid he did not hit Andy.  Father explained that when a couple confronted him, Father told them "he didn't do anything."  Detective Walterscheid informed Father two witnesses had seen Father throw Andy into the back seat of his car and hit him numerous times.  Father adamantly denied the allegations and stated "he never put his hand(s) on his son." Father said he picked up Andy because he was crying.  Father loved Andy and had raised him since he was eight months old.

Andy told the investigating social worker Father hit him in the face with an open hand.  When asked how many times, Andy answered, "Twenty.  He hit me one hundred."  Andy stated Father hit him "a lot of time" because Father did not like him. Officer Edwards told the social worker that Andy had told him, "When my dad is mad at me, he hits me."  But when the investigating social worker interviewed Father, Father stated he did not hit Andy.  Father said Andy was crying because he did not want to go home from a friend's house.  He claimed Andy "will cry for no reason."

---

[3]     *Miranda v. Arizona* (1966) 384 U.S. 436, 467-469.

El Monte Police Officer Luis Soberanes and Detective Walterscheid viewed the convenience store's surveillance video later that evening. The video showed when Father took Andy out of the car, Andy was crying and resisted going with Father. Father abruptly picked up Andy and carried him into the store. When Father placed Andy on the floor, Andy continued to cry and refused to move. Father tripped and nearly fell on top of Andy. Father stood up, carried Andy to the cash register, placed him on the counter, and purchased cigarettes. After Father and Andy walked outside, Father carried Andy back to the car.

Officer Soberanes could not see what happened next, explaining, "[Father] placed [Andy] in the rear right passenger seat; however, due to the camera's angle I was unable to see [Father] strike [Andy]." Detective Walterscheid stated, "This surveillance video does not illustrate [Father] beating or throwing or hitting Andy. This surveillance video does show at least two witnesses who were patrons of the market and [had] just entered their vehicle and were preparing to drive away when something caused them to exit their vehicle and walk over to [Father's] vehicle. A female subject is seen making a telephone call on her cellular telephone and also having a conversation with [Father] or confronting [Father] regarding what she just witnessed and then [Father] drives away from the market . . . ."

B. *Andy's Medical Examination*

On June 17, 2019 family nurse practitioner Omar Penney conducted a medical examination of Andy. Penney reported Andy had "[l]ower leg shin bangers," "[r]ight outer leg 2cm mark unknown," "[r]ight side of neck 1cm red mark unknown," "[r]ight lower chin raised around area, resembling a bug bite," and a

5

"[s]car to the [r]ight eyebrow." Penney stated Andy was difficult to interview and photograph because he ran around the room and avoided conversation and photographs. Andy told Penney, "[Father] hit me (open hand, pointed to the right side of his face), gas station, in the car, today." Andy refused to explain how he got the small abrasions on his neck. Andy stated he lived with only Father and repeatedly asked to go back home with Father.

On June 19, 2019 a medical doctor noted on Andy's medical report: "Reviewed. History very suspicious for physical abuse; physical findings indeterminate."

C.    *The Dependency Petition and Detention*

On June 18, 2019 the Los Angeles County Department of Children and Family Services (Department) filed a petition on behalf of Andy pursuant to section 300, subdivisions (a) and (b)(1). The petition alleged in counts a-1 and b-1 that on June 16, 2019 Father was arrested for child abuse after Father physically abused Andy by grabbing his shoulders, throwing him into the back seat of Father's car, and repeatedly striking him in the face. Father's physical abuse of Andy endangered Andy and placed him at risk of serious physical harm.

At the June 20, 2019 detention hearing, the juvenile court noted, "Andy came in the courtroom [and] he went right to his dad and now has popped himself on his lap." The court found Father was Andy's presumed Father. It detained Andy from Father and placed Andy in foster care under the Department's supervision. The court ordered the Department to assess paternal relatives for placement and to serve as possible visitation monitors. The court granted Father monitored visits for a minimum of six hours each week.

D.  *The Jurisdiction and Disposition Report*

The jurisdiction and disposition report stated Andy was placed in the home of paternal uncle Nelson C. and aunt Michelle C. on June 21, 2019.  Michelle reported Father and Andy had lived in her home on two prior occasions when Andy was very young.  She never saw Father hit Andy while they lived in her home.  But Michelle did not know how Father disciplined Andy when they did not live with her.  Michelle stated Andy "cries non-stop for hours if he does not get his way, such as playing with" video games.  Andy was "very active" and had to be redirected often.  He was "very bright for his age" and was a good reader.

Andy told the dependency investigator the police took Father and placed Andy in the back seat of the police car because "[t]hose people said they saw me."  Andy added, "Why were they looking at me?"  When asked why people were looking at him, Andy responded, "My dad hit me."  Andy stated when Father hit him, Andy cried because it hurt.  Andy also said he was crying because he did not want Father to hit him.  But Andy wanted to return home, stating, "I want to go live with my dad.  How come I can't go live with my dad[?]"

Father reported he was raising Andy by himself because Mother did not want to care for the child.  Mother last visited Andy in 2013 and last communicated by text with Father in 2016.  Mother told Father that she did not want to see him or Andy.  Father did not know Mother's whereabouts or how to contact her.  The Department was unable to contact or locate Mother.

On June 19, 2019 Father was charged with misdemeanor child abuse (Pen. Code, § 273a, subd. (b)).  Two days later the superior court issued a criminal protective order ordering Father

7

to stay at least 100 yards away from Andy and to have no contact with the child except for court-ordered visits.

Father had two-hour visits with Andy every Sunday, monitored by the paternal aunt or uncle. Father stated he could not visit more often because of his work schedule and his reluctance to inconvenience his family, although his family was willing to help him and Andy. As of July 24, 2019 Father had attended one class of a 10-week parenting program.

### E.    *The Jurisdiction and Disposition Hearing*

At the August 27, 2019 jurisdiction and disposition hearing, the juvenile court sustained the physical abuse allegations in counts a-1 and b-1 of the petition. The court credited Andy's and the percipient witnesses' statements in the Department reports that Father hit Andy. The court observed, "[I]t looks like what precipitated all this was Father's perspective was his son had taken himself out of the seat belt and that caused Father to become upset. Then it looks like the son, when he's inside the store, refused to walk." But "Father yelling to his son to shut up . . . suggests that he was not in control of his own conduct at the time. The minor also indicates that his father would hit him on other occasions."

The court added, "There's no reason where [Andy] would manufacture a story of that sort. Now, the number of times seems to be a focus of attention for Father's counsel. However, a child of this age being struck repeatedly by the father, five times, could feel like fifteen times. And so I don't think the number or any discrepancy there is telling. [¶] The child, in fact, described how he was struck. He said it was with an open hand to his face. And he said that he was crying because his father hit him and it

8

hurt and he didn't want his father to strike him. When asked why his father would hit him, he says: when my father gets mad at me, he hits me. [¶] . . . [¶] . . . He also indicated where he was struck on the face. He said the right side of the face. There's also scarring to the face. There is some dispute about where it came from, but it's consistent with where the child has said he had been struck. [¶] So with all this evidence, I think what we have here is a pattern, not just an isolated incident . . . ."

Father's attorney argued Andy should be released to Father's care because Andy wished to return home and was attached to Father; Father was attending parenting classes; the criminal court protective order protected Andy; and additional protections could be put in place such as unannounced home visits and family preservation services. The juvenile court denied Father's request, explaining, "[Father has] denied the minor's rendition of the facts. The minor's rendition of the fact[s] is consistent with the percipient information from witnesses that were there at the scene who called law enforcement. Law enforcement followed up. [¶] Now, I understand he is engaged. And I see the minor in court with Father, and I don't want [to] make light of that. But what I want to see is . . . where he's got traction in his programs and there's some level of confidence that this is where the child will be safe because what the child described is serious and cannot be ignored. And the protection that you're talking about, I think, would not be sufficient given the way [Father's] described the events, which the court finds to be at cross-purposes with the overwhelming evidence."

The juvenile court removed Andy from Father's physical custody pursuant to section 361, subdivision (c)(1).[4] The court found "by clear and convincing evidence there would a substantial danger to the physical health, safety, protection and well-being of the child if returned home." Further, the court found "[t]here are no reasonable means by which the child's physical health would be protected without removing the child from the father's physical custody."

The juvenile court ordered Father to participate in anger management and parenting classes, individual counseling to address case issues, and conjoint counseling with Andy, if and when appropriate. The court granted Father monitored visits for a minimum of six hours per week with the Department having discretion to liberalize visitation.

Father timely appealed.

## DISCUSSION

A.  *Standard of Review*

"'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note

---

[4]     The court found it was not necessary to remove Andy from Mother's physical custody because her whereabouts were unknown.

that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court."'" (*In re I.J.* (2013) 56 Cal.4th 766, 773; accord, *In re R.T.* (2017) 3 Cal.5th 622, 633.) "When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable factfinder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011 (*O.B.*).) "The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or orders." (*In re E.E.* (2020) 49 Cal.App.5th 195, 206; accord, *In re D.B.* (2018) 26 Cal.App.5th 320, 328-329.)

B.    *Substantial Evidence Supports the Jurisdictional Finding Under Section 300, Subdivision (a)*

Section 300, subdivision (a), "authorizes jurisdiction if the 'child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian.'" (*In re Isabella F.* (2014) 226 Cal.App.4th 128, 138; accord, *In re N.M.* (2011) 197 Cal.App.4th 159, 165.) "[A] court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings, or a combination of these and other actions by the parent or guardian that indicate the child is at risk of serious physical harm." (§ 300, subd. (a).) "The juvenile court need not wait until a child is

11

seriously abused or injured before it takes jurisdiction under section 300, subdivision (a), and the court may consider past events in deciding whether a child currently needs its protection." (*Isabella F.*, at p. 138; *N.M.*, at p. 165.)

Father contends there is insufficient evidence to support the jurisdictional finding under section 300, subdivision (a), because Andy did not suffer serious physical harm and was not at substantial risk of serious physical harm. Father relies on his own statements in which he denied punishing or hitting Andy and claimed Andy would cry for no reason. Father also questions Andy's reliability, noting Andy stated Father hit him 20 times and also 100 times. Further, Father asserts the male customer's statements are unreliable because he told the police he confronted Father and said he would call the police, but the surveillance video shows his girlfriend confronted Father and made the phone call.

Father's arguments are not persuasive because we do not reweigh the evidence or judge the credibility of witnesses on appeal. (*In re I.J., supra*, 56 Cal.4th at p. 773; *In re R.T., supra*, 3 Cal.5th at p. 633.) The juvenile court found Andy's disclosure of physical abuse to be credible, noting Andy provided specific details, including that Father hit him with an open hand and struck him on the right side of his face, causing Andy to cry. Andy's statements were corroborated by percipient witnesses. The store clerk and two customers saw Father grab Andy and throw him into the back seat of Father's car. The store clerk reported Father threw Andy inside the car so violently that it caused "the vehicle to shake." Both the clerk and the male

12

customer then saw Father strike Andy multiple times with both hands.[5]

Father also argues there is insufficient evidence Andy suffered serious physical harm because Officer Edwards did not see any new visible injuries on Andy. But when Officer Edwards conducted a traffic stop of Father's car shortly after the June 16, 2019 incident, he noted Andy's "right face (cheek) was very red" and Andy was sobbing uncontrollably. Officer Edwards's observation is consistent with Andy's disclosure during his medical examination the next day that Father hit him with an open hand on the right side of his face. Further, the medical doctor found the physical marks on Andy observed during the medical examination were "very suspicious for physical abuse."

Alternatively, Father asserts he was using physical discipline to stop Andy from crying and throwing a tantrum. "Whether a parent's use of discipline on a particular occasion falls within (or instead exceeds) the scope of this parental right to discipline turns on three considerations: (1) whether the parent's conduct is genuinely disciplinary; (2) whether the punishment is 'necess[ary]' (that is, whether the discipline was 'warranted by the circumstances'); and (3) 'whether the amount of punishment was reasonable or excessive.'" (*In re D.M.* (2015) 242 Cal.App.4th 634, 641.) There is no evidence Father's punishment of Andy was intended as discipline. Further, Father adamantly denied he hit Andy or punished him. Even if Father was disciplining Andy,

---

[5]    Father points out the surveillance video did not show Father hit Andy. But as Father acknowledges, Officer Soberanes stated he was unable to see Father hit Andy because of the camera angle.

violently throwing him into the car and repeatedly striking him in the face was excessive punishment regardless of Andy's behavior.

Moreover, the juvenile court found a pattern of physical abuse. Andy stated, "When my dad is mad at me, he hits me." Andy also reported Father hit him "a lot of time" because Father did not like him. Father argues it is unclear whether Andy's statement was limited to the June 16 incident or described a pattern of physical abuse. But reviewing the record in the light most favorable to the court's determinations, there was substantial evidence Father had physically abused Andy on June 16 and on prior occasions. (*In re I.J., supra*, 56 Cal.4th at p. 773; *In re R.T., supra*, 3 Cal.5th at p. 633.) On this record, substantial evidence supports the juvenile court's jurisdictional finding under section 300, subdivision (a).

C. *The Juvenile Court's Jurisdictional Finding Under Section 300, Subdivision (b)(1), Is Not Supported by Substantial Evidence*

"Section 300, subdivision (b)(1), authorizes a juvenile court to exercise dependency jurisdiction over a child if the 'child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child, or . . . by the inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness, developmental disability, or substance abuse.'" (*In re L.W.* (2019) 32 Cal.App.5th 840, 848; accord, *In re E.E., supra*, 49 Cal.App.5th at p. 205.) Section 300, subdivision (b)(1), requires the Department "to demonstrate three elements by a

14

preponderance of the evidence: (1) one or more of the statutorily specified omissions in providing care for the child (inability to protect or supervise the child, the failure of the parent to provide the child with adequate food, clothing, shelter, or medical treatment, or inability to provide regular care for the child due to mental illness, developmental disability or substance abuse); (2) causation; and (3) 'serious physical harm or illness' to the minor, or a 'substantial risk' of such harm or illness." (*In re Joaquin C.* (2017) 15 Cal.App.5th 537, 561; accord, *In re R.T., supra,* 3 Cal.5th at p. 624; *E.E.*, at p. 205.)

Father contends there is no evidence to support the jurisdictional finding under section 300, subdivision (b)(1), because there was no showing of Father's failure or inability "to adequately supervise or protect" Andy from physical harm. We agree the jurisdictional finding under section 300, subdivision (b)(1), must be reversed because the evidence showed Father's physical abuse of Andy, which supported jurisdiction under section 300, subdivision (a), but not Father's failure to protect Andy from Father's own abuse.

D.      *Substantial Evidence Supports the Removal Order*

"'At the dispositional hearing, a dependent child may not be taken from the physical custody of the parent under section 361 unless the court finds there is clear and convincing evidence there is or would be a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being if returned home, and that there are no reasonable means to protect the child's physical health without removing the child.'" (*In re D.P.* (2020) 44 Cal.App.5th 1058, 1065; accord, *In re G.C.* (2020) 48 Cal.App.5th 257, 265; see § 361, subd. (c)(1).) The

15

juvenile court must determine "whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his or her home" and "shall state the facts on which the decision to remove the minor is based." (§ 361, subd. (e).)

"In determining whether a child may be safely maintained in the parent's physical custody, the juvenile court may consider the parent's past conduct and current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention." (*In re D.B., supra*, 26 Cal.App.5th at p. 332; accord, *In re N.M., supra,* 197 Cal.App.4th at p. 170.) "A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent. [Citation.] 'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child.'" (*N.M.*, at pp. 169-170; accord, *D.B.*, at p. 328.) We review the entire record to determine whether the removal order is supported by substantial evidence. (*O.B., supra*, 9 Cal.5th at p. 1011; *D.B.*, at pp. 328-329.)

There is substantial evidence from which a reasonable trier of fact could have found it highly probable there was a substantial risk of physical harm to Andy if he were returned home and there were no reasonable alternatives to removal. (*O.B., supra*, 9 Cal.5th at p. 1011.) The juvenile court found alternatives to removal such as unannounced home visits and family preservation services would not protect then-six-year-old Andy because Father continued to deny his physical abuse of the child. Further, at the time of the disposition hearing, Father had attended one parenting class out of a 10-week course and had not yet participated in anger management classes or individual

16

counseling.  Given Andy's young age, Father's refusal to accept responsibility for his conduct, and Father's limited participation in services, the juvenile court's removal order was proper.

## DISPOSITION

The jurisdictional finding under section 300, subdivision (b)(1), is reversed, but the jurisdictional finding under section 300, subdivision (a), and dispositional order are affirmed.


FEUER, J.

We concur:


PERLUSS, P. J.


SEGAL, J.