Filed 2/20/24  In re M.V. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re M.V. et al., Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E082018 |
| Plaintiff and Respondent, | (Super.Ct.No. DPIN2300121) |
| v. | OPINION |
| J.V., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Edward Forstenzer, Judge.  (Retired judge of the Mono Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Marisa L. D. Conroy, under appointment by the Court of Appeal, for Defendant and Appellant.

Minh C. Tran, County Counsel, Teresa K.B. Beecham and Prabhath Shettigar, Deputy County Counsel, for Plaintiff and Respondent.

The juvenile court removed M.V., A.Z., J.V., and N.Z. (the children) from parents' custody and granted parents reunification services. On appeal, defendant and appellant J.L.V. (father)[1] contends insufficient evidence supports the juvenile court's removal order. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On June 4, 2023, personnel from plaintiff and respondent, Riverside County Department of Public Social Services (the department), received a 10-day response referral in which it was reported that mother, under the influence of cocaine, began hallucinating and experiencing paranoia.[2] She barricaded herself, M.V., J.V., and A.Z. inside the master bedroom closet with a large dresser placed against the door from inside.[3] Mother texted one of A.Z.'s friends writing, "'Help, I am going to die.'" The friend called the police.

Police forced their way into the home. M.V. had sustained an injury to her nose.[4] Father admitted buying cocaine for mother and having it delivered to the home. He

---

[1] Father is the biological and presumed father of J.V. and M.V. A.Z. Jr. is the biological and presumed father of A.Z. and N.Z.; A.Z. Jr. is not a party to the appeal.

[2] Mother is not a party to the appeal.

[3] N.Z. was apparently in father's custody during the incident.

[4] Pictures of the injury were attached to the detention report.

reported that mother and he had previously used cocaine together. Police arrested mother for child endangerment.

A responding officer noted that mother appeared to have a hole in her nose due to snorting cocaine. The police report reflected mother ingested and was addicted to methamphetamine and cocaine.

Mother reported that she snorted cocaine every five days and had used methamphetamine three times. Father obtained the cocaine for her while he was away for the weekend out of state. Mother noted that she and father would use cocaine together in social situations.

Mother later denied using regularly, denied that father had procured the cocaine for her, denied that father used cocaine, and denied using methamphetamine. Mother reported suffering from anxiety and depression for which she had been prescribed medication. She indicated she and the children were in the closet for 40 minutes. Mother's saliva tested positive for opioids. She said she had taken a Vicodin that morning, which she obtained from a friend who was a drug dealer.

M.V. reported that mother had barricaded them in the closet with a dresser blocking the door so that they could not get out; she stated they were in the closet for two days and that she and her sisters were not able to eat or use the restroom. Mother told J.V. to urinate on herself, which she did. M.V. sustained a cut to her nose because a large item fell on top of her when mother was moving the dresser into the closet. She said she felt safe in the home.

3

A.Z. reported they were in the closet for an hour. She felt safe in the home. A.Z. "noted that her mother has not behaved this way before, and denied seeing the mother or [father] abuse drugs."

Father reported that he and mother used cocaine together every two to three months when the children were with relatives. Father "disclosed he felt guilty that the mother was upset, so he bought her a gram of cocaine." "[M]other called him . . . at two in the morning, stating she did not know what was real. The mother was blaming him for being involved in a 'sex cult' due to text messages that she saw on his laptop. The mother hung up and then his phone calls to her began to go straight to voicemail. The father expressed he was worried so he contacted the neighbors and management to go check on the mother and children. Management broke down the door, and the neighbors found the mother and children barricaded in the closet. Next, the father contacted the maternal aunt to go to the home to try to calm the mother down. The father did not contact law enforcement during the incident."

Father tested negative for all substances. "He expressed he has not left the mother unattended since the incident, and did not plan to. He stated he is going to be watching her and when he is at work, the maternal grandmother or aunt would come to the home. However, [father] did not follow through with his plan and left the mother alone with the children on two different occasions since [the department's] initial contact with the family."

4

On June 8, 2023, department personnel took the children into protective custody. On June 9, 2023, the department placed all the children with A.Z. and N.Z.'s paternal aunt and uncle.

On June 12, 2023, department personnel filed a Welfare and Institutions Code section 300 petition alleging, as pertinent here, that M.V. sustained an abrasion due to the incident (a-1); mother had placed the children at substantial risk of suffering physical harm (b-1); mother had untreated substance abuse issues (b-2); mother had unresolved mental health issues (b-3); mother had kept drugs in the home (b-4); father had untreated substance abuse issues (b-9); father purchased cocaine and had it delivered to mother (b-10); A.Z., M.V., and J.V. had suffered serious emotional damage due to the incident (c-1, c-2, & c-3); and N.Z.'s siblings had been abused, placing him at risk for similar harm (j-1).[5]  On June 13, 2023, the court detained the children.

In the jurisdiction and disposition report filed June 30, 2023, the social worker recommended the court find the allegations in the petition true, remove the children, and grant parents reunification services.  M.V. reported they were "in the closet a[ ]long time, but could not differentiate between hours or days."  She said mother told A.Z. to call the police.  Mother said they were in the closet for "20-30 minutes"; J.V. urinated herself while she was sleeping as she was newly potty trained.  Mother said she was "[n]ot saying any of this was okay, but it was a short period, so they weren't hungry or thirsty."  Mother reported that both she and a neighbor called the police.

---

[5]  The first amended petition filed July 18, 2023, did not substantively alter the allegations in the original petition.

5

Father reported that the police misrepresented the situation to make it appear "'as if the children were being physically hurt, but [mother] was only trying to keep them safe.'" He reported that he started using cocaine a year earlier. After the department detained the children, he stopped drinking and using cocaine. The detention was an "'eye opener.'" He wanted better for his children and have them returned to his care. He reported he was "already enrolled in the Family Preservation Program and tried to enroll in a parenting program but they told him there was a waiting list."

A.Z. and N.Z. both stated they felt safe in and wanted to return home. M.V. and J.V. were not asked due to their young age.

On July 6, 2023, the court set the matter for a contested jurisdiction and disposition hearing. In the addendum report field August 23, 2023, the social worker reported mother had enrolled in a substance abuse program on June 30, 2023; all her drug tests had been negative. Mother was scheduled to begin a parenting class on August 23, 2023. Mother was participating in NA and AA meetings four to five days weekly.

Father continued to attend a substance abuse program and completed random drug testing. He had attended a few NA and AA meetings. Father was scheduled to begin a parenting class on August 23, 2023.

A.Z. "reported, her visits with her mother and [father] have been going well . . . ." "The mother and [father] are very attentive to [A.Z.]'s needs, and are engaging through the whole visit. They play games together and talk during the visit. They do not allow her to be on her phone during the visit. During one of the visits, the mother and [father]

6

took [A.Z.]'s phone away for a few days because she was being disrespectful during the visit. [A.Z] does not wish to have any visits with her [biological] father . . . ."

M.V.'s "visits with her parents have been going well. The parents are engaging during the visits. They play games, read books with her, and spend individual time with her." J.V.'s "[v]isits with her parents always go well. She always asks her parents, when is she able to return home with them. During the visits, the parents are very engaging with [J.V.], and attentive to her needs."

On August 28, 2023, father's counsel submitted a progress report that reflected father had attended 12 group sessions and two individual sessions in his outpatient substance abuse program. Father had tested negative 10 times for controlled substances.

At the contested jurisdiction and disposition hearing on the same day, father's counsel argued, "My client indicated to the worker that he had not used cocaine in two months when this case came in. He also has been participating in substance abuse treatment class. He's more than willing to do a hair follicle test to show the Court he's not using, but he is asking for the Court to not remove custody from him and that he had the children in his care. He will continue to participate in services."

The children's counsel noted that, as to father, "there is some evidence that [he] went and brought Mother the drugs that she was using which caused her psychosis or whatever happened that day. He knew about it." "In the delivered service logs, there's plenty of time when the Department tried to get him to do drug test and he would fail to drug test. I believe that family reunification services is also fair to him at this time. And

I think—this was pretty bad." The children's counsel submitted on the social worker's recommendation.

The department argued, "This is a significant incident. I believe father . . . while he's shown improvement as to his own personal issues, his lack of insight as to providing the controlled substances that lead to this issue, I believe, properly support the claims that are outlined in the petition." The court found the allegations in the petition true, removed the children from parents' custody, and granted parents reunification services.

## II. DISCUSSION

Father contends insufficient evidence supports the juvenile court's removal order. We disagree.

"Section 361 is the governing statute, and it imposes restraints on the juvenile court's authority to remove a child from a parent's physical custody. [Citation.] It provides that '[a] dependent child shall not be taken from the physical custody of his or her parents, . . . unless the juvenile court finds clear and convincing evidence' that '[t]here is or would be a *substantial danger* to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody.' [Citation.]" (*In re M.V.* (2022) 78 Cal.App.5th 944, 958 (*M.V.*).)

""The elevated burden of proof for removal from the home . . . reflects the Legislature's recognition of the rights of parents to the care, custody and management of

8

their children, and further reflects an effort to keep children in their homes where it is safe to do so. [Citations.] By requiring clear and convincing evidence of the risk of substantial harm to the child if returned home and the lack of reasonable means short of removal to protect the child's safety, section 361, subdivision (c) demonstrates the 'bias of the controlling statute is on family preservation, not removal.'"' [Citation.]" (*M.V.*, *supra*, 78 Cal.App.5th at p. 959.)

"California dependency laws 'establish that out-of-home placement is not a proper means of hedging against the possibility of failed reunification efforts, or of securing parental cooperation with those efforts. It is a last resort, to be considered only when the child would be in danger if allowed to reside with the parent. The law requires that a child remain in parental custody pending the resolution of dependency proceedings, *despite the problems that led the court to take jurisdiction over the child*, unless the court is clearly convinced that such a disposition would harm the child. The high standard of proof by which this finding must be made is an essential aspect of the presumptive, constitutional right of parents to care for their children.' [Citations.]" (*M.V.*, *supra*, 78 Cal.App.5th at p. 959.)

"We review a dispositional order removing a child from a parent for substantial evidence, '"keeping in mind that the trial court was required to make its order based on the higher standard of clear and convincing evidence."' [Citation.] '[A]ppellate review of the sufficiency of the evidence in support of a finding requiring clear and convincing proof must account for the level of confidence this standard demands.' [Citation.] In

9

applying this standard of review, 'the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true.' [Citation.] We view the record in the light most favorable to the prevailing party and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence. [Citation.]" (*M.V.*, *supra*, 78 Cal.App.5th at p. 960.)

Here, there was evidence that mother frequently used cocaine. She reported using every five days. A responding officer noted mother's septum had a hole in it from apparent, frequent use of cocaine. Mother also reported being addicted to methamphetamine. Both mother and father reported using cocaine together. Father disclosed that he had purchased and had cocaine delivered to mother while she was alone with three of the children because she was "upset."

There was evidence that mother binged on cocaine and used methamphetamine while caring for three of the children alone. She became paranoid and hallucinated; she barricaded herself and three of the children in a closet for up to two days during which the children were unable to eat. While barricading the closet door, M.V. sustained an injury to her nose when a large item fell off the dresser. Mother would not allow J.V. to use the restroom; she told J.V. urinate herself, which J.V. did. Officers arrested mother for child endangerment.

When notified about the situation, father did not call the authorities. Father gave reports about the incident that were inconsistent with other evidence; father said he called management who broke down the door and found the children. However, the police report reflects that it was police who busted down the door after a call from mother's friend who, in turn, had been texted by one of the children.

Father believed the police had exaggerated the danger of the situation. After the incident, father said that he was going to ensure that mother was not left alone with the children; however, he subsequently left mother alone with the children on at least two occasions. Thus, the juvenile court could reasonably have found that both parents minimized the seriousness of the incident and their own issues with substance abuse. Substantial evidence supported the court's removal order because there was evidence that would support a conclusion that parents might repeat the same behavior which led to the detention.

Father contends *In re Savannah M.* (2005) 131 Cal.App.4th 1387 (*Savannah M.*) overruled on other grounds in *In re R.T.* (2017) 3 Cal.5th 622, 626-633, and *In re Henry V.* (2004) 119 Cal.App.4th 522 (*Henry V.*), compel a holding that insufficient evidence supports the juvenile court's finding in this case. We disagree.

In *Savannah M.*, the mother challenged the court's finding sustaining the allegations that the child was at substantial risk of serious physical harm based on the parents' conduct of leaving the minor with a man who sexually molested her. (*Savannah*

11

*M.*, *supra*, 131 Cal.App.4th at pp. 1394-1398.)  The *Savannah M.* court agreed.  (*Id*. at p. 1398.)

However, father does not challenge the juvenile court's jurisdictional findings. Thus, *Savannah M.* does not support his contention that the court's removal order, based upon unchallenged, sustained findings of future harm, are not supported by substantial evidence.  *Savannah M.* does not address the issue of removal at all.  Moreover, the allegations in *Savannah M.* were based on the acts of a third party who had been apprehended by police and, therefore, no longer posed a threat in the home.  (*Savannah M.*, *supra*, 131 Cal.App.4th at p. 1391.)  Here, mother and father, who would obviously remain in the home, were the persons who posed the threat to the children.

In *Henry V.*, the court held that the substantial physical abuse suffered by the minor was not an obstacle to the return of the minor because it "was apparently a single occurrence."  (*Henry V.*, *supra*, 119 Cal.App.4th at p. 529.)  The *Henry V.* court also observed that the juvenile court in that case neither mentioned the clear and convincing standard nor the requirement that it consider alternative means to protect the minor without removal.  (*Id*. at pp. 529-530.)

This court has previously disagreed with the analysis in *Henry V.* that a single incident of substantial physical harm does not support removal.  (*In re L.O.* (2021) 67 Cal.App.5th 227, 246.)  We also agree, as did the court in *L.O.*, that *Henry V.* is "factually distinguishable because [the children were] not subjected to a single incident, but rather a continuing risk of harm.  Further, in this case, unlike *Henry V.*, the social

12

worker had not suggested out-of-home placement of [the children] would be useful to secure Father's further cooperation." (*Ibid*.)

We acknowledge that the juvenile court here neither orally mentioned the standard of proof nor the requirement that it consider alternatives to removal.[6] (*In re L.O.*, *supra*, 67 Cal.App.5th at p. 247 ["The court's minute order of the . . . dispositional hearing 'is not a replacement for a statement of the facts supporting the court's decision to remove a child from a parent's custody.' [Citation.]"].) However, prior to the court's ruling, father's counsel expressly noted the burden of proof, arguing she did "not believe, based on the facts of this case, that there is clear and convincing evidence of a risk of harm to the safety or protection of the children if they were in [father's] care." Thus, father expressly informed the court of the burden of proof immediately prior to the court's ruling.

Moreover, "the court's failure to 'discuss' a particular standard does not imply it applied an incorrect standard. Error on appeal must be affirmatively shown by the record, and '[w]e presume the trial court knew and properly applied the law absent evidence to the contrary.' [Citation.]" (*J.H. v. G.H.* (2021) 63 Cal.App.5th 633, 644.) Finally, any error was harmless because, "[b]ased on our review of the entire record, and as discussed previously, we conclude it is not reasonably probable that the court would

---

**6** The recommended findings and orders, which the court adopted, explicitly provided that there was clear and convincing evidence to support removal. Likewise, the minute order reflects that clear and convincing evidence supported removal. Similarly, the recommended findings and orders and minute order reflect that the department made reasonable efforts to return the children to parents' custody in lieu of removal.

have found that [the children] could safely be returned home." (*In re L.O.*, *supra*, 67 Cal.App.5th at p. 247.)

## III.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
J.

We concur:

RAMIREZ
P. J.

RAPHAEL
J.